## GRAHAM *v.* BRUMMETT.

(Division A. June 6, 1938. Suggestion of Error Overruled June 20, 1938.)

[181 So. 721. No. 33176.]

Watkins & Eager, of Jackson, for appellant.

Barnett, Jones & Barnett and John E. Stone, all of Jackson, for appellee.

Argued orally by **Tom Watkins**, for appellant, and by **Ross R. Barnett**, for appellee.

**McGowen, J.**, delivered the opinion of the court.

Brummett, the appellee, recovered a judgment against the appellant, Graham, for personal injuries sustained by him as the servant of the latter while about the performance of his duties.

Tersely stated, the essential facts are these: The appellee testified that there were two scaffolds, an upper scaffold approximately fourteen feet above the concrete floor of the stave mill in which he was working for the appellant; and a lower one, approximately a foot and a half below the upper scaffold; that the upper scaffold consisted of two by eight inch planks, which ran east by west, parallel with each other and approximately two feet apart; that he ascended to the upper scaffold upon a ladder which was resting against the first board of the upper scaffold on the south side; that the ladder was near the west end of the board; that south of the upper scaffold, and east of the ladder there was a lower scaffold, the first board of which, nearest to the higher scaffold was approximately two and a half feet south of the south board of the higher scaffold, and approximately a foot and a half lower than the south board of the higher scaffold. Just north of the southernmost plank of the upper scaffold, and approximately six feet west of the east side of the upper scaffold, there was a drive-shaft and wheel over which a belt ran, the wheel being approximately four feet in diameter. Appellee ascended the upper scaf-

fold to adjust that belt, climbing the ladder which led to the southernmost board of the upper scaffolds, from which point he states that he stepped across on to the other boards of the upper scaffold, walked in an easterly direction down one of these boards, and stepped back across to the southernmost board of the upper scaffold, on the east side of the drive shaft wheel, where he did his work, shifting the belt. While so engaged the superintendent, Kellogg, told him to come down and start the engine. He attempted to descend by stepping from the southernmost board of the upper scaffold to the northernmost board of the lower scaffold, which step was made from a point about two and a half feet north of, and one and a half feet higher than, the board on which he was stepping; and he testified that in the attempt to make this step the board on which he was standing slipped backward, and he fell twelve feet to the pavement below, from which fall he suffered injuries, breaking his arm, and, as he claims, injuring his back.

He further testified that there was oil and dirt on the planks of the upper scaffold, and that the plank from which he attempted to descend slipped backwards; that some weeks later he returned to the scene and found the line where the plank had slipped, and also that a new nail had been driven through the plank in question. He further testified that he was acting in obedience to the general orders of the master, Graham, that he and another were to take the place of a negro who was being discharged for the sake of economy, one of whose duties was to assist in replacing the belt of the wheel on this upper scaffold.

The jury were warranted in finding from his testimony that he slipped in undertaking to descend because of the oil and grease, and the failure of the master to have the plank nailed down, making it possible for it to slip when appellee stepped on it. Brummett gave as a reason for adopting this method of descending to the concrete floor, rather than by the way he ascended, that the point

was nearest to him, that he would have had to pass under the machinery by stooping while negotiating an eight-inch plank. This was the first time he had engaged in the performance of duty on the upper platform, having worked elsewhere in the mill.

His testimony and that of his son, who was a witness, was to the effect that another employe engaged in and about the work on the upper platform ordinarily used the route by which appellee undertook to descend, naming employes whom he had seen do so. On this point he stated that other employes went down the way he attempted to go without any objection being raised to it. He further testified that a banister should have been installed for the employes to hold to, but he is hazy as to how this could have been done, to render the descent by that route less dangerous. He also testified that the distance between the eight-inch planks laid on the upper platform was dangerous, and implied negligence.

Ralph Brummett testified that prior to the accident sustained by his father he had seen the planks vibrate and shake when the mill was in operation, and that at the place where his father slipped the planks had oil and dirt on them. He testified that he had seen other employes descending in the same manner attempted by his father—not often, only when a belt would break. Sometimes the employes would descend by the lower platform route, and sometimes by the one by which Brummett descended—that those descending by the lower platform route had to hold on to something.

Wm. H. Brummett, a son of the appellee in the employ of Graham, testified that immediately after the injury to his father he examined the platform; that the distance to step down was twenty-three inches, and that the distance between plank's was twenty-seven inches. He further testified that he had seen Kellogg, the superintendent in active charge of the operation of this stave mill, descend in the manner attempted by his father; and on cross-examination said that was the usual walk-way,

that the plank at that end was not nailed down; that although the plank had been there three or four months it had never been nailed down, evidenced by the fact that there were no nail holes in it. This plank had slipped back from the direction in which his father was descending, and he fell.

The general tenor of appellee's evidence was to the effect that planks on the upper platform, were too far apart; that banisters could and should have been installed to insure the safety of the employes; that the planks at and about the point of descent were covered with oil and dirt, and that the plank from which he undertook to step was loose, and had been for sometime; that the master knew, or should have known, that his employes were ordinarily using the method of descent adopted by the appellant.

All the material evidence of Brummett and his witnesses was sharply contradicted by witnesses for the appellant. For instance, the distance from the upper to the lower platform, when measured by the appellant, was ascertained to be fifty-seven inches; the evidence for appellant tended to show that it was suicidal for a person undertaking to descend from the upper to the lower platform to take the route by which appellee attempted to descend.

The main instruction given for the appellee by the court is as follows: "The court instructs the jury for the plaintiff that under the law it is the non-delegable and continuing duty of an employer to use reasonable care in furnishing to an employe a reasonably safe place to work, and this duty is a continuing one and if you believe from a preponderance of the evidence in this case that the plaintiff was working at a place where his duties called him and that the plank he attempted to step from was not nailed and not securely fastened and such condition of sideplank, if any as shown by the evidence, had existed for a long period of time and that the defendant knew of same, or should have known of same by the

exercise of ordinary care *and that the defendant was negligent in maintaining the plank walkway as testified by plaintiff and his witnesses,* and plaintiff was using same in the manner and way the same was intended to be used and was exercising reasonable care for his own safety and was using said walkway on the occasion of his injury as an ordinary prudent man would have used same under the circumstances, and if you further believe that such negligence, if any, was the proximate cause or contributed to the plaintiff's injuries, then it will be the sworn duty of the jury to return a verdict for the plaintiff.''

The negligence charged in the declaration, and sought to be established, was that the master was negligent in violating the non-delegable duty of the master to exercise reasonable care to furnish the servant a reasonably safe place to work, and this duty is a continuing one.

It is urgently contended by the appellant that he was entitled to a peremptory instruction because (1) the evidence entirely fails to show that any negligence of the appellant approximately contributed to appellee's injury; (2) the evidence, undisputed, shows that appellee, in attempting the descent from the scaffold, chose an obviously dangerous route, when there were at his disposal other obviously safer means of descending. We shall consider the two as one. In the case of Favre v. Louisville & N. R. Co. (Miss.), 178 So. 327, the court approved the rule invoked by appellant in the case at bar, which is as follows (page 329) : ''We have repeatedly held that when the master has provided a reasonably safe method or means of doing certain work, and the servant elects to use different and dangerous methods, he cannot recover for the reason that such acts become the negligence of the servant and not of the master. Stokes v. Adams-Newell Lumber Co., 151 Miss. 711, 715, 118 So. 441, and the cases therein cited. This principle was more fully stated in Newell Contracting Co. v. Flynt, 172 Miss. 719, 728, 161 So. 298, 301, 743.''

We are of the opinion, however, that the jury were warranted in finding, from the appellee's evidence, that the route used by him was customarily used by other employes, and even by the general superintendent, who was shown to be present directing the operations, while the master, as a rule, was not present. The son testified that the superintendent himself had been seen to use this route. This rendered it a question for the jury to decide whether or not the custom of the employes, under the immediate supervision of Kellogg, in making the descent by this method, was adopted by the master. Further, it was a question for the jury to weigh, taking into consideration the condition of the platform, as described by the appellee and his witnesses, and the conditions under which he was working at the time, which was the safer route. We do not think the case of Favre v. Louisville & N. R. Co., supra, is controlling here, but we have very recently considered this question in the case of Stricklin v. Harvey, 179 So. 345, wherein the injured employe walked on a temporary bridge, some stringers of which had been creosoted; the master had provided boats for crossing the river, but the employes had for some time been using the temporary bridge. In this case, paraphrasing that, but for the fact that there was positive testimony on behalf of the appellee that the plank from which he was about to step down was not nailed, and never had been, as he started to descend by a route which he had seen the other employes ordinarily and safely use, we should be inclined to say that there was no negligence of the master which proximately caused or contributed to the injury of the servant in the case at bar.

This case comes within the rule announced in Hardy v. Turner-Farber-Love Co., Inc., 136 Miss. 355, 101 So. 489. We cannot say that a step-down of a foot and a half from one platform to another, and across the distance of twenty-seven inches, is so obviously dangerous as to conclude the servant. The jury have evidently found that the

plank from which the servant undertook to descend was not nailed, and had not been. The platform had been in use for some time. The fact that the plank was not nailed contributed to the servant's fall, and on the doctrine of the assumption of risk, the servant in this state does not assume the risk resulting from the negligence of the master. In other words, where the master is negligent, and that negligence contributes directly and proximately to the servant's injury, there is no assumption of risk as to such negligence in this state.

Passing now to the instruction complained of, it will be readily seen that this instruction did not in the slightest degree limit the fancy or imagination of the jury as to what negligence it might conceive the master to be guilty of, in the light of the testimony offered by the appellee. He had undertaken to show that banisters should have been erected on the platform; that oil or grease and dirt were on the planks, and, likewise, that the planks, eight inches in width, on the upper platform were placed too far apart, so that it was difficult to step from one to the other. The language thereof, italicized, opened wide the gate, "and that the defendant was negligent in maintaining the plank walkway as testified by plaintiff and his witnesses." The court by this instruction did not in any manner point out that part of the testimony of appellee and his witnesses which indicated negligence in this case. It should have been limited. The instruction really meant that if the jury believed that the appellee had testified to anything which they believed to be negligent, they could so find. An instruction which does not guide the jury, but on the contrary is confusing and misleading, so that all the evidence of the appellee, as we have pointed out, was left open to be considered by the jury as negligence, without restriction, is certainly erroneous, and most probably induced the verdict in this case. There is no attempt to cure this broad, sweeping instruction. We think it was fatally erroneous. The in-

592

struction in this case having been pointed at liability, the case must be reversed generally.

There are other assignments of error which we shall not consider at this time, as most probably they will not recur on another trial.

Reversed and remanded.